# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

| | | |
|---|---|---|
| LINDA DAWN HARDMAN, | ) | |
|      Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 2:16-CV-493-PRC |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner of the | ) | |
| Social Security Administration, | ) | |
|      Defendant. | ) | |

## OPINION AND ORDER

This matter is before the Court on a Complaint [DE 1], filed by Plaintiff Linda Dawn Hardman on November 23, 2016, and a Plaintiff's Opening Brief [DE 12], filed by Plaintiff on March 31, 2017. Plaintiff requests that the May 7, 2015 decision of the Administrative Law Judge denying her claim for disability insurance benefits be reversed and remanded for an award of benefits or for further proceedings. On July 6, 2017, the Commissioner filed a response, and Plaintiff filed a reply on July 28, 2017. For the following reasons, the Court grants Plaintiff's request for remand.

## PROCEDURAL BACKGROUND

On February 7, 2013, Plaintiff filed an application for disability insurance benefits, alleging disability since September 21, 2012. The application was denied initially and on reconsideration. On April 16, 2015, Administrative Law Judge Margaret Carey ("ALJ") held a hearing by video conference. In attendance at the hearing were Plaintiff, Plaintiff's attorney, and an impartial vocational expert. At the hearing, Plaintiff amended her onset date to October 25, 2013. On May 7, 2015, the ALJ issued a written decision denying benefits, making the following findings:

> 1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2017.

2.      The claimant has not engaged in substantial gainful activity since October 25, 2013, the alleged onset date.

3.      The claimant has the following severe impairments: postural orthostatic tachycardia syndrome (POTS), Meniere's disease/vertigo, migraines, and degenerative disc disease.

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except: occasional overhead reaching; occasional ramps and stairs; never climbing ladders, scaffolds, or ropes; never kneeling, crouching, crawling, or balancing; never at unprotected heights, around moving mechanical parts, or operating a motor vehicle; no exposure to extreme heat, vibration, or noxious odors or fumes; noise to be exposed to is limited to the moderate level; and the claimant is limited so that no conveyer belt type of machine would be moving past her field of vision.

6.      The claimant is unable to perform any past relevant work.

7.      The claimant was born [in 1968] and was 45 years old, which is defined as a younger individual age 45-49, on the alleged disability onset date.

8.      The claimant has at least a high school education and is able to communicate in English.

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11.     The claimant has not been under a disability, as defined in the Social Security Act, from October 25, 2013, through the date of this decision.

(AR 16-22).

The Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. § 404.981. Plaintiff filed this civil action pursuant to 42 U.S.C. § 405(g) for review of the Agency's decision.

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c) and 42 U.S.C. § 405(g).

## STANDARD OF REVIEW

The Social Security Act authorizes judicial review of the final decision of the agency and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Thus, a court reviewing the findings of an ALJ will reverse only if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard. *See Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, or substitute its judgment for that of the ALJ. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, the question upon judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ "uses the correct legal standards and

the decision is supported by substantial evidence." *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013) (citing *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010); *Prochaska v. Barnhart*, 454 F.3d 731, 734-35 (7th Cir. 2006); *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)). "[I]f the Commissioner commits an error of law," the Court may reverse the decision "without regard to the volume of evidence in support of the factual findings." *White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999) (citing *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997)).

At a minimum, an ALJ must articulate her analysis of the evidence in order to allow the reviewing court to trace the path of her reasoning and to be assured that the ALJ considered the important evidence. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995). An ALJ must "'build an accurate and logical bridge from the evidence to [the] conclusion' so that [a reviewing court] may assess the validity of the agency's final decision and afford [a claimant] meaningful review." *Giles v. Astrue*, 483 F.3d 483, 487 (7th Cir. 2007) (quoting *Scott*, 297 F.3d at 595)); *see also O'Connor-Spinner*, 627 F.3d at 618 ("An ALJ need not specifically address every piece of evidence, but must provide a 'logical bridge' between the evidence and his conclusions."); *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001) ("[T]he ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits.").

### DISABILITY STANDARD

To be eligible for disability benefits, a claimant must establish that she suffers from a "disability" as defined by the Social Security Act and regulations. The Act defines "disability" as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be

expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). To be found disabled, the claimant's impairment must not only prevent her from doing her previous work, but considering her age, education, and work experience, it must also prevent her from engaging in any other type of substantial gainful activity that exists in significant numbers in the economy. 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1520(e)-(f).

When a claimant alleges a disability, Social Security regulations provide a five-step inquiry to evaluate whether the claimant is entitled to benefits. 20 C.F.R. § 404.1520(a)(4). The steps are: (1) Is the claimant engaged in substantial gainful activity? If yes, the claimant is not disabled, and the claim is denied; if no, the inquiry proceeds to step two; (2) Does the claimant have an impairment or combination of impairments that are severe? If no, the claimant is not disabled, and the claim is denied; if yes, the inquiry proceeds to step three; (3) Do(es) the impairment(s) meet or equal a listed impairment in the appendix to the regulations? If yes, the claimant is automatically considered disabled; if no, then the inquiry proceeds to step four; (4) Can the claimant do the claimant's past relevant work? If yes, the claimant is not disabled, and the claim is denied; if no, then the inquiry proceeds to step five; (5) Can the claimant perform other work given the claimant's residual functional capacity (RFC), age, education, and experience? If yes, then the claimant is not disabled, and the claim is denied; if no, the claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(i)-(v); *see also Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir. 2004).

At steps four and five, the ALJ must consider an assessment of the claimant's RFC. The RFC "is an administrative assessment of what work-related activities an individual can perform despite [her] limitations." *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001). The RFC should be based on evidence in the record. *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008) (citing 20 C.F.R.

§ 404.1545(a)(3)). The claimant bears the burden of proving steps one through four, whereas the burden at step five is on the ALJ. *Zurawski*, 245 F.3d at 885-86; *see also Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

## BACKGROUND

*1.    Medical Evidence*

On November 5, 2012, Plaintiff's auditory canal was observed to have bloody discharge and was impacted with cerumen. (AR 335). Her examination was largely normal, except that, on the balance/step test, she had an abnormal deviation to the left. *Id*. She had no nystagmus, which is repetitive, involuntary movements of the eyes. *Id*. Plaintiff was advised to stop driving and doing other hazardous activities, and she was educated on balance principles and dizziness precautions. (AR 336).

Plaintiff participated in physical therapy from November 13, 2012, to May 29, 2013, for Meniere's disease/dizziness/giddiness, referred by her treating physician, Lonnie L. Amico, M.D. (AR 471-544). At the initial visit on November 13, 2012, the physical therapy records report that Plaintiff had been diagnosed with Meniere's disease approximately ten years earlier. (AR 471). Plaintiff reported left ear pain and left side head/neck pain; headaches for one year on the left side; waves of dizziness if moving her head too fast, turning in bed, and sometimes when sitting; increased symptoms of dizziness in the past six months; tinnitus, buzzing, and high-pitched sounds in both ears that come and go; blurred vision, eyes constantly changing, and tunnel vision; numbness that comes and goes on the left side of her face, the fourth and fifth digits of her left hand, and her left foot; and fluctuating balance and losing her balance mostly to the left. *Id*. Plaintiff reported that she was independent in all daily functional activities. *Id*. The goal of physical therapy was to resolve

the symptoms of dizziness. *Id.* On exam, Plaintiff was negative for nystagmus on gazing right and left; however, she had instant dizziness and increased ANS with gazing right, hot sensation down the arms, unsteady/disequilibrium. (AR 472). With upward gaze, she was negative for nystagmus, but reported dizziness like doing a somersault. *Id.* Her downward gaze was normal. *Id.* On VOR (vestibulo-ocular relfex), she had instant dizziness with her head to the right. *Id.* She was diagnosed with a peripheral vestibular system dysfunction and decreased stability in visually deprived environments, complicated by a cervicogenic headache component and POTS. *Id.*

Plaintiff participated in physical therapy sessions on December 10, 2012; December 12, 2012; December 17, 2012; December 27, 2012; January 7, 2013; January 14, 2013; January 17, 2013; January 21, 2013; January 24, 2013; February 4, 2013; February 7, 2013; February 12, 2013; February 15, 2013; February 18, 2013; February 21, 2013; March 4, 2013; March 7, 2013; March 18, 2013; March 20, 2013; March 28, 2013; April 28, 2013; May 2, 2013; May 6, 2013: May 9, 2013; May 17, 2013; May 22, 2013; May 29, 2013. (AR 467-544). Frequently, the treatment notes show increased symptoms following treatment. *See, e.g.*, (AR 484, 486, 488, 490, 499, 501). The January 17, 2013 note reported that Plaintiff was responding to therapeutic intervention, but the January 24, 2013 note indicated that she was having difficulty and an increase of symptoms with all therapeutic exercise. (AR 493, 499). Treatment notes in February and March 2013 show Plaintiff responsive to therapy, but she reported on March 18, 2013 that she woke up with a headache, dizziness, nausea, visual aura, and left CSA pain. (AR 503, 505, 508, 512, 518, 520). In May 2013, Plaintiff reported increased headaches and dizziness. (AR 531, 537, 539, 541). The final physical therapy note, dated May 29, 2013, provides that Plaintiff "has responded to treatment with the ability to tolerate higher level activities with improved stability and only a mild increase in symptoms."

(AR 543). Nevertheless, the "patient problems" list included, a peripheral vestibular system dysfunction, decreased static/dynamic balance, escalation of symptoms in visually stimulating/changing environments, escalation of symptoms in visually deprived environments, and motion intolerance. *Id.*

On February 26, 2013, Dr. Marcello Cherchi evaluated Plaintiff for dizziness. The impressions were "chronic disequilibrium episodic exacerbations and sensitivity to complex visual stimuli, and fluctuating binaural (left greater than right) symptoms of fullness and tinnitus, all since 1999." (AR 407). Dr. Cherchi found that Meniere's disease seems less likely in her current complaints because her audiogram was normal. *Id.* On examination, she had "normal posture, station, and gait," and "[n]ormal unsighted tandem Romberg stance." (AR 407). On "video frenzel oculography" Dr. Cherchi noted "no spontaneous nystagmus." *Id.* The note further states, "[a]pplying vibration to the left side of the neck elicited a 1/10 right beating nystagmus" and "[t]here was no pathological gaze-evoked nystagmus." *Id.*

On July 29, 2013, Plaintiff presented for an initial evaluation of headaches. (AR 548). She reported an onset one year earlier with neck pain and dizziness becoming worse. *Id.* The doctor noted hospital records for headaches in 2010 and 2009. *Id.* Plaintiff reported that the headaches occurred daily and were severe, lasting from 10-60 minutes. The report shows a history of "Menieres in past but no evidence now." *Id.* The doctor noted normal hearing, normal gait, and normal eye movement during the 90-minute exam. *Id.* Plaintiff's diagnosis of POTS was noted.

On December 12, 2014, Plaintiff presented for testing at the Balance Center with a referral for dizziness. The examination could not be done because it was "marred by extraneous eye movement artifact and reveals low total eye speed." (AR 854).

On November 3, 2014, Dr. Amico continued to treat Plaintiff for dizziness, with the prior visit on October 14, 2014. A review of symptoms included dizziness and imbalance, headache, visual disturbances, ringing in the ears, and vertigo. On examination, Dr. Amico noted primary gaze nystagmus with video frenzel. (AR 884). He wrote, "She was positional on frenzel and had significant motion sickness." (AR 885).

At a visit with Dr. Amico on March 6, 2015, Plaintiff's dizziness was described as a spinning sensation with an onset two years earlier. (AR 876). Plaintiff described the dizziness as moderate in severity and unchanged. As for her migraines, she reported pain and visual disturbance with significant motion intolerance. As for her vertigo, she reported daily migraines, being dizzy all the time with head turning. Multiple attempts to resolve the migraines with medication were unsuccessful. *Id.*

On March 11, 2015, Plaintiff was seen by Dr. Louis Teodori, an associate of Dr. Amico's, for an evaluation regarding recent near syncope and a history of postural orthostatic tachycardic syndrome. (AR 873). Dr. Teodori noted Plaintiff's treatment with Dr. Amico on an outpatient basis for POTS and migraine. Dr. Teodori noted Plaintiff's continued complaint of intermittent dizziness. Plaintiff reported that she almost passed out while on the toilet but did not lose consciousness. *Id.* Plaintiff was referred to the autonomic clinic for outpatient treatment. (AR 874).

In a March 12, 2015 letter to Plaintiff's attorney, Dr. Amico wrote that Plaintiff was evaluated on March 6, 2015, and noted that she has severe orthostatic tachycardia and vasovagal hypotension. Dr. Amico wrote, "When she bears down, moves, or stands for prolonged periods of time, she becomes totally incapacitated and, if she does not become recumbent, she will lose consciousness. She also has intermittent vertigo and intractable migraine accompaniments." (AR

898). Dr. Amico wrote that he felt that Plaintiff "is totally unable to work at the present moment." *Id.*

In a second letter to Plaintiff's attorney, dated March 19, 2015, Dr. Amico stated that, based on a March 18, 2015 examination, Plaintiff's "symptoms seem to have progressed and seem to be evolving." (AR 1018). Dr. Amico wrote, "[s]he now not only has orthostatic or postural near syncope (fainting) but also has developed a vasovagal response and was recently admitted with this." *Id.* He indicated that he was referring Plaintiff to Dr. Teodori for evaluation for autonomic dysfunction. He again opined that Plaintiff is "completely unable to work in the foreseeable future." *Id.*

Various treatment notes identify balance and gait problems related to Plaintiff's impairments, including the November 13, 2012 physical therapy initial evaluation, (AR 471, 476); a December 27, 2012 physical therapy daily note indicating "decreased static/dynamic balance," (AR 486); and a March 18, 2013 physical therapy note indicating a positive Romberg and "Romberg position with vision occluded was abnormal with a posterior and right mild disequilibrium. Sharpened Romberg with vision occluded was abnormal with a mild plus posterior and right disequilibrium with the right foot in the posterior position; moderate posterior and left disequilibrium with the left foot in the posterior position," (AR 521). A November 30, 2012 treatment note by Dr. Amico notes "trouble walking, unsteadiness" and noting an abnormal gait/balance with a deviation to the left on examination. (AR 563). Dr. Amico's November 5, 2012 treatment record shows Plaintiff presenting for a "balance evaluation," with Plaintiff reporting that she experiences dizziness (spinning sensation) that occurs in attacks with sneezing, straining, standing up from a lying position (POTS), standing up from a sitting position, and when changing position; ear pain; neck stiffness on left side;

migraine headaches; and sounds in her ears (ringing, buzzing, high pitched sounds). Plaintiff reported an onset of over 15 years ago, which she described as moderate in severity and worsening in the last year. The record shows her problem list including Meniere's disease, dizziness, migraine, syncope, hypotension, anxiety, and back pain. On review of symptoms, Dr. Amico noted dizziness, imbalance, spinning sensation, numbness and tingling in limbs. On physical examination, he noted "abnormal deviation left" for gait/balance. (AR 567).

2. *Treating Physician Opinion*

On May 18, 2015, Dr. Amico completed a Physical Residual Function Capacity Medical Source Statement, listing Plaintiff's diagnoses as POTS and vasovagal syncope. (AR 1008-1011). He identified her symptom as severe blood pressure drop. *Id*. He identified the most significant clinical findings and objective signs as severe faintness. *Id*. He noted no pain and no medication side effects but that the impairments and symptoms had lasted since September 12, 2012.

Dr. Amico opined that Plaintiff can never lift or carry any weight, cannot walk a block or more on rough or uneven ground, cannot climb steps without use of a handrail at a reasonable pace, and cannot stoop, crouch, or bend. (AR 1008-09). He further opined that she needs to lie down or recline intermittently due to low blood pressure and that she can only sit or stand and walk intermittently through an eight-hour work day. (AR 1009). Dr. Amico opined that Plaintiff would be "off task" more than 30% of an eight-hour work day. (AR 1011). In response to the questions of, on average, how many days per month is Plaintiff likely to be absent from work or unable to complete an eight-hour work day, he wrote, "unable to work." *Id*. He opined that she is not able to perform a job, eight hours per day, five days per week on a sustained basis. *Id*. He attributed this to

"constant blood pressure drop - respiratory." *Id*. He based his opinion on the history and medical file as well as personal observation. *Id*.

3.    *Plaintiff's Testimony*

Plaintiff testified that she experiences a variety of severe symptoms every day. Since 2012, she has migraine headaches accompanied by neck and shoulder pain. (AR 48). She testified that, frequently, her heart begins to race and she experiences vertigo or feels faint, especially when she walks a flight of stairs or on an incline; she also has visual disturbances every day during which she sees black stars and silver stars and her vision is blurry, usually when she is standing. (AR 52). Sometimes the episodes pass quickly, but sometimes they last up to five minutes. (AR 61). Afterwards, she is fatigued and feels she could sleep for hours. *Id*. Plaintiff testified that she has vagal episodes every day, which start with a violent vertigo spin and then she becomes hot and sweats profusely. (AR 62). She testified that she also becomes nauseous and sometimes "everything goes black." *Id*. She said she loses her vision for a few seconds, but she has not fallen down. *Id*. She testified that for about three months, the episodes occurred every time she used the toilet. (AR 63). She further testified that, for the previous couple of weeks, the episodes occurred at every meal, three or four times per day. *Id*. She sometimes has difficulty swallowing severe enough to prevent her from eating or drinking. (AR 50-51). Plaintiff testified that her vision is blurry and that she has muscle spasms above and below her left eye, that the left side of her face and teeth become numb, and that the ringing in her ears changes from high-pitched to a buzzing. (AR 53). Plaintiff testified that frequently either the vertigo or nerve pain wakes her up at night and that rolling over in bed seems to trigger the vertigo. (AR 67). Plaintiff testified that she does very little housework because of her conditions. (AR 56). She explained that she can wash a couple of dishes leaning on the

kitchen counter but then she has to sit down because she gets hot and sweaty and begins to feel faint. *Id*. When she tried to vacuum the living room, she had to sit down three times. *Id.* Because of the vagal attacks, she avoids using the toilet or taking a shower when her boyfriend is away. (AR 62). Plaintiff testified that she has not left her home without another person for two and a half years. (AR 61).

4.    *Vocational Expert Testimony*

The vocational expert testified that a person restricted to sedentary work; occasional overhead reaching and walking on ramps and stairs; never climbing, kneeling, crouching, crawling, or balancing;  no exposure to unprotected heights, moving mechanical parts, operating a motor vehicle, or extreme heat, vibration, or noxious odors; a moderate noise level; and no conveyor belt moving past the field of vision could work as a document preparer, a telephone quotation clerk, or a hand mounter. (AR 72-73). When asked how the jobs would be affected if the worker needed a break every hour for ten minutes to deal with pain and/or nausea and dizziness, the vocational expert testified that if the break did not exceed ten minutes the jobs would be reduced by seventy percent but if the individual were off task for more than ten minutes in an hour, there would be no jobs available. (AR 74).

## ANALYSIS

Plaintiff seeks remand, arguing that the ALJ erred by crafting an RFC that was not supported by substantial evidence, by failing to give proper weight to her treating physician's opinion, and by failing to properly address Plaintiff's subjective complaints. All of the arguments in Plaintiff's brief are made in relation to her severe impairments of postural orthostatic tachycardia syndrome (POTS), Meniere's disease/vertigo, and migraines. Plaintiff does not challenge the ALJ's finding that her

13

gastrointestinal impairments, mental impairments, and obesity are not severe impairments nor does she argue that the ALJ failed to incorporate limitations in the RFC based on these non-severe impairments or on her degenerative disc disease. The Court considers each of Plaintiff's arguments in turn.

## A. Credibility

In making a disability determination, the ALJ must consider a claimant's statements about her symptoms, such as pain, and how the symptoms affect her daily life and ability to work. *See* 20 C.F.R. § 404.1529(a). Subjective allegations of disabling symptoms alone cannot support a finding of disability. *Id.* The ALJ must weigh the claimant's subjective complaints, the relevant objective medical evidence, and any other evidence of the following factors:

(1)  The individual's daily activities;
(2)  Location, duration, frequency, and intensity of pain or other symptoms;
(3)  Precipitating and aggravating factors;
(4)  Type, dosage, effectiveness, and side effects of any medication;
(5)  Treatment, other than medication, for relief of pain or other symptoms;
(6)  Other measures taken to relieve pain or other symptoms;
(7)  Other factors concerning functional limitations due to pain or other symptoms.

*See* 20 C.F.R. § 404.1529(c)(3). "An ALJ must adequately explain [her] credibility finding by discussing specific reasons supported by the record." *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013) (citing *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009)); SSR 96-7p, 1996 WL 374186, at *2 (Jul. 2, 1996) ("The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the

individual's statements and the reasons for that weight.").[1] A credibility determination will be overturned only if it is patently wrong. *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006).

Plaintiff notes that the ALJ used the "boilerplate" language that Plaintiff's subjective complaints were "not entirely credible for the reasons explained in this decision." *See* (AR 19); *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010). Although this language itself is not meaningful, its use is not fatal if the ALJ goes on to provide a proper analysis of the evidence of record. *Moore v. Colvin*, 743 F.3d 1118, 1122 (7th Cir. 2014). In this case, as argued by Plaintiff, remand is required because the ALJ did not conduct a proper analysis of the record. The ALJ recited Plaintiff's complaints and various aspects of the record without explaining how the record conflicted with those subjective complaints.

First, the ALJ did not address activities of daily living in the context of the physical RFC or Plaintiff's credibility related to her physical impairments but only considered activities of daily living at step two in the context of determining whether Plaintiff has a severe mental impairment, stating, "The claimant has a boyfriend with whom she lives. She performs household chores and goes out in public when her physical impairments allow her to do so." (AR 17). The ALJ ignored the uncontradicted evidence that Plaintiff cannot drive a car; has difficulty riding in a car because of vertigo and motion sickness; experiences shortness of breath and increased heart rate that sometimes leads to chest pain, vertigo, and fatigue when she walks stairs or an incline; experiences "vertigo spins" when she walks a short distance; has vasovagal attacks when she eats and sometimes cannot swallow; can only wash a few dishes and then must sit down, and has to lean on the counter;

---

[1] The Social Security Administration clarified in October 2017 that Social Security Ruling 16-3p only applies when the ALJs "make determinations and decisions on or after March 28, 2016" and that Social Security Ruling 96-7p governs cases decided before that date. *See* Notices, Social Security Ruling 16-3p, 2017 WL 4790249 (Oct. 25, 2017). The ALJ issued her decision on May 7, 2015; therefore, Social Security Ruling 96-7p governs.

avoids using the toilet when her boyfriend is not home; tried to vacuum but sat down three times; spends most of the day on the couch watching TV; and experiences vertigo sometimes when reading.

Second, the ALJ did not discuss Plaintiff's medications or other treatments, factors that aggravate or relieve her symptoms, or test results that corroborate her testimony. Nor is there any indication from the decision that the ALJ considered these factors. As discussed more thoroughly in the RFC analysis in Part C below, the ALJ contrasts findings or repeated complaints in the treatment records that support Plaintiff's subjective complaints with findings from examinations that do not have any apparent connection to the given complaint or to her severe impairments of POTS, vasovagal syndrome, or migraines. The ALJ offers no explanation of how the findings on which she relies are inconsistent with Plaintiff's diagnoses or limitations on her activities. For example, the ALJ wrote, "Since her alleged onset date, the claimant has demonstrated significant motion intolerance," (AR 19), and then goes on to note, without explanation of their relevance, negative findings of several objective tests that do not appear to have any connection to Plaintiff's motion intolerance. *See Moore*, 743 F.3d at 1125 ("Further, the ALJ cannot reject a claimant's testimony about limitations on her daily activities solely by stating that such testimony is unsupported by the medical evidence." (quoting *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004))).

Third, in discounting the effects of Plaintiff's migraines, the ALJ noted that Plaintiff had not required frequent emergency room visits for her migraines. (AR 19). However, Plaintiff testified that no medications relieved the pain of her migraines. (AR 49). And, the record shows hospital treatment for migraines in 2009 and 2010, (AR 548), and her treating physician reported in her medical record on March 6, 2015, that her migraines were "refractory," meaning resistant to treatment, (AR 876). Under these circumstances, there does not appear to be a reason for Plaintiff

to go to the emergency room for treatment of her migraines, and the ALJ does not explain why lack of emergency room treatment for migraines lessens her credibility in light of her medical history.

In addition, the ALJ stated that Plaintiff "has often denied any headaches." (AR 20 (citing Ex. 21F, 29F, and 30F)). First, not all of these records support the ALJ's statement. Exhibit 21F is ten pages of treatment records dated April 8, April 23, and May 9, 2014, from the APAC Groupe Centers for Pain Management, where Plaintiff received an epidural injection on April 23, 2014 for lower back and hip pain. (AR 832-841). In the initial consultation record, the "History of Present Illness" section logically discusses only her back-related pain. (AR 838). Yet, the "Problem List" includes "headache" along with hypotensive episode, irregular heart beat, murmur, and nausea, and the "Review of Systems" includes "headache" for "neurological." (AR 838, 839). Likewise, the follow up report dated May 9, 2014, lists the headache as a current problem but the other treatment notes are relevant to the success of the steroid injection. (AR 832-33). Second, Exhibit 29F is 59 pages of hospital records, including imaging studies, lab results, emergency department visits for chest pain, and treatment for back pain, (AR 938-996); however, one record lists headaches as a current problem, (AR 950 (2/13/2015)). Third, Exhibit 30F is additional treatment records from APAC Groupe Centers for Pain Management, for lower back pain in June 2014 and for neck pain in March 2015. (AR 997-1007). And, again, these records list headache as a current problem. (AR 998 (3/17/2015), 1001 (6/10/2014)).

Moreover, the record is replete with instances of Plaintiff repeatedly and consistently reporting headaches to her treating physicians. *See* (AR 330 (11/30/2012), 481 (12/17/2012), 488 (1/7/2013), 492 (1/17/2013), 495 (1/17/2013), 497 (1/21/2013), 499 (1/24/2013), 501 (2/4/2013), 520 (3/18/2013), 523 (3/18/2013), 531 (5/2/2013), 548 (7/29/2013), 585 (11/1/2012) ("has been

developing migraine headaches"), 813 (10/12/2013), 815 (10/22/2013), 819 (12/19/2013)). On February 7, 2013, the physical therapy treatment note indicated that she did not complain of headache that date, suggesting that she normally complained of headaches. (AR 503). Plaintiff also indicated to her physical therapist that her dizziness and migraines fluctuate. (AR 497). Thus, the fact that Plaintiff stated on one or two occasions that she did not have a headache when she was presenting for an injection to relieve her lower back pain is not evidence contradicting Plaintiff's subjective symptoms of migraines.

In other words, the ALJ's analysis of Plaintiff's subjective complaints does not identify any inconsistencies between her complaints and the evidence of record. As noted by the Commissioner, "[a]pplicants for disability benefits have an incentive to exaggerate their symptoms, and an administrative law judge is free to discount the applicant's testimony on the basis of the other evidence in the case." *Johnson v. Barnhart*, 449 F.3d 804, 805 (7th Cir. 2006). However, the ALJ in this case ignored significant aspects of the record that are consistent with Plaintiff's asserted limitations. Remand is necessary for the ALJ to address this evidence in assessing Plaintiff's subjective complaints because, if fully credited, Plaintiff's limitations would affect her ability to sustain an eight-hour work day, which, in turn, would affect the disability determination.

### B. Treating Physician

In determining whether a claimant is disabled, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence . . . received." 20 C.F.R. § 404.1527(b). And, the ALJ evaluates every medical opinion received. 20 C.F.R. § 405.1527(c). This includes the opinions of nonexamining sources such as state agency medical and psychological consultants as well as outside medical experts consulted by the ALJ. *Id.* § 405.1527(e)(2).

An ALJ must give the opinion of a treating doctor controlling weight if (1) the opinion is supported by "medically acceptable clinical and laboratory diagnostic techniques" and (2) it is "not inconsistent" with substantial evidence of record. *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010); *see also Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). In weighing all opinion evidence, the ALJ considers several factors and "must explain in the decision the weight given" to each opinion. 20 C.F.R. § 404.1527(e)(2)(ii), (iii); *Scrogham v. Colvin*, 765 F.3d 685, 697-98 (7th Cir. 2014); *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). When a treating physician's opinion is not given controlling weight, the ALJ must nevertheless consider certain factors to determine how much weight to give the opinion, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability (such as medical signs and laboratory findings), and specialization. 20 C.F.R. § 404.1527(c)(2)-(5).

Plaintiff argues that the ALJ erred by giving the opinion of Plaintiff's treating physician, Dr. Amico, little weight. Plaintiff notes that the ALJ accepted Dr. Amico's opinion that Plaintiff should never drive a car at work. (AR 20). However, Plaintiff then argues that the ALJ did not explain why Dr. Amico's other conclusions about Plaintiff's limitations were entitled to little weight, given that the ALJ only made a broad and conclusory statement that they "are simply not supported by the totality of the evidence, including his own treatment notes" along with a few inaccurate observations about the record. *Id.* The Court agrees that the evidence cited by the ALJ in support of discounting Dr. Amico's opinion is either incorrect or not relevant to the opinion and that the ALJ did not address evidence that supports Dr. Amico's opinion.

First, the ALJ notes that "diagnostic imaging of the claimant's head have consistently been normal." (AR 20 (citing Exs. 24F, 28F, and 29F)). As noted in the analysis of the RFC determination

below, the ALJ does not explain how those diagnostic images are related to Plaintiff's medically determinable impairments or how they are inconsistent with Dr. Amico's opinion.

Next, the ALJ notes that Plaintiff's gate had routinely been normal. (AR 20 (citing Ex. 21F, 24F, 29F, 30F, 33F)). However, there are also treatment records showing an abnormal gait. *See* (AR 331 (11/30/2012), 486 (12/27/2012), 563 (11/30/2012), 567 (11/5/2012)).

Third, the ALJ wrote that Plaintiff "has had normal pulses." (AR 20 (citing Ex. 17F, 21F, 23F, 24F, 29F)). However, the ALJ does not explain how these observations are inconsistent with Dr. Amico's opinion, nor is it apparent. As discussed below, Plaintiff experienced negative test results related to balance, and, Plaintiff repeatedly reported dizziness. *See* (AR 328, 471, 497, 533, 556, 815, 819, 977). These records are consistent with the limitations opined by Dr. Amico.

Fourth, the ALJ again notes the lack of emergency room visits for her migraines. As discussed above, this is not a basis for discounting the symptoms of Plaintiff's headaches. Plaintiff consistently reported migraines with hospital visits in 2009 and 2010. *See* (AR 330, 481, 488, 492, 495, 497, 499, 501, 503, 520, 523, 531, 533, 548, 585, 813, 815, 819).

Dr. Amico's opinion appears to be supported by both the treatment records and other medical records. The ALJ was not qualified to second guess Dr. Amico's opinion, especially without citation to the record. *Roddy v. Astrue*, 705 F.3d 631, 637 (7th Cir. 2013) (remanding when the ALJ failed to explain why he found that the physician's opinion about the claimant's pain was inconsistent with the MRI findings).

Finally, the ALJ reasons that "Dr. Amico's assertions that the claimant is unable to carry out the obligations of her occupation (Exhibit 13F) and is totally unable to work (Exhibits 25F; 32F) are findings reserved solely for the Commissioner." (AR 20). The three documents cited by the ALJ are

letters written by Dr. Amico to Plaintiff's attorney or "To Whom It May Concern." In each, Dr. Amico first sets out the symptoms of Plaintiff's impairments such as "persistent vertigo, visual disturbances, and numbness," (Ex. 13F; AR 545); "orthostatic tachycardia and vasovagal hypotension" that causes her to "become[]" totally incapacitated and, if she does not become recumbent, she will lose consciousness" and has "intermittent vertigo" and "intractable migraine accompaniments," (Ex 25F; AR 898); and "has developed a vasovagal response and was recently admitted with this with her physicians unable to find a way to give her relief," (AR 32F; AR 1018). Dr. Amico then opines in each letter that the limitations render her unable to carry out the obligations of her occupation. These are not statements that Plaintiff is "disabled" or "limited to sedentary work," which are findings reserved for the Commissioner, but rather are statements about the functional limitations resulting from specific impairments based on medical judgment. *See Collins v. Astrue*, 324 F. App'x 516, 520 (7th Cir. 2009). The Court notes that the ALJ provided no specific discussion of the May 18, 2015 Physical Residual Functional Capacity Medical Source Statement completed by Dr. Amico. (AR 1008-1012).

Dr. Amico was a treating physician with a relevant specialty, who treated Plaintiff on a consistent basis over an extended period of time. If the ALJ had credited his opinion, a finding of disabled would likely have followed. Remand is necessary for proper evaluation of Dr. Amico's treating opinion.

### C. Residual Functional Capacity

The Residual Functional Capacity ("RFC") is a measure of what an individual can do despite the limitations imposed by her impairments. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004); 20 C.F.R. § 404.1545(a). The determination of a claimant's RFC is a legal decision rather than a

medical one. 20 C.F.R. § 404.1527(e)(1); *Diaz*, 55 F.3d at 306 n.2. The RFC is an issue at steps four and five of the sequential evaluation process and must be supported by substantial evidence. SSR 96-8p, 1996 WL 374184, *3 (July 2, 1996); *Clifford*, 227 F.3d at 870.

"RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing' basis means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, at *1. "The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* at *3. The relevant evidence includes medical history; medical signs and laboratory findings; the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment; evidence from attempts to work; need for a structured living environment; and work evaluations, if available. *Id.* at *5. In arriving at an RFC, the ALJ "must consider all allegations of physical and mental limitations or restrictions and make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC." *Id.* The "ALJ must also consider the combined effects of all the claimant's impairments, even those that would not be considered severe in isolation." *Terry*, 580 F.3d at 477; *see also Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003).

Plaintiff argues that it is unclear how the ALJ accounted for the severe impairments of POTS, migraine headaches, Meniere's disease/vertigo, and degenerative disc disease in formulating the RFC. Plaintiff contends that the ALJ's discussion is a scattered recitation of both normal and abnormal observations in the record with a summary conclusion that Plaintiff can perform a limited range of sedentary work without any discussion of how the findings support the conclusion. The Court agrees that the ALJ did not create a logical bridge between the evidence and her conclusion

given that she does not explain how the evidence she identifies supports the RFC and that she does not address other relevant evidence that demonstrates greater restrictions.

As discussed above, the ALJ did not adequately articulate the reasoning in support of the credibility determination and, thus, may not have properly incorporated limitations supported by Plaintiff's credible testimony. In addition, the ALJ does not explain how the medical records cited contradict the medical evidence of Plaintiff's impairments and resulting limitations. For example, the ALJ noted that she "has been observed to have no nystagmus." (AR 19 (citing Ex. 24F)). But, on other occasions Plaintiff was observed to have nystagmus. *See* (AR 407, 884). And, other vision tests produced dizziness throughout the physical therapy sessions. The ALJ identifies only negative evidence regarding nystagmus but fails to address favorable evidence on the very same issue. This is not an instance in which the ALJ was "not required to discuss every snippet of information from the medical records that might be inconsistent with the rest of the objective medical evidence." *Pepper v. Colvin*, 712 F.3e 351, 33 (7th Cir. 2013). The ALJ also fails to explain how Plaintiff having been observed to have no nystagmus on certain occasions contradicts the evidence of Plaintiff's dizziness and related limitations.

The ALJ also notes a negative CT scan of the temporal bone; a CT scan of her brain that showed no evidence of acute intracranial abnormality; and an unremarkable CT angiogram of Plaintiff's head and neck. (AR 19). Yet, the ALJ does not connect these findings to any of Plaintiff's conditions and/or claims.

The ALJ appears to discount Plaintiff's tachycardia, stating that Plaintiff was consistently found to have a normal heart rate and rhythm and had normal sinus rhythm on an EKG: "At times, [Plaintiff] has exhibited murmurs, but she has frequently been noted to have normal heart sounds

with no murmurs." (AR 19 (citing Ex. 29F)). However, this broad reference to murmurs minimizes other relevant evidence, such as the record of an emergency department visit for chest pain, during which Plaintiff was on continuous cardiac monitoring and was found to have significant arrhythmia (abnormal rhythm). (AR 957-58); *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009) (finding that the ALJ overlooked medical records that contradicted his conclusion and came to his own independent medical conclusions in deciding that the claimant's impairments were not disabling). The ALJ did not explain why Plaintiff's vital signs at checkups were more relevant than her cardiac emergency. Moreover, Dr. Amico's treatment records and opinion supports Plaintiff's POTS symptoms and the resulting limitations.

The ALJ also ignored Dr. Cherchi's February 26, 2013 impressions of chronic disequilibrium episodic exacerbations and sensitivity to complex visual stimuli as well as fluctuating binaural (left greater than right) symptoms of fullness and tinnitus, all since 1999. (AR 403). Dr. Cherchi noted that the initial history in 1999 plus the finding of vibration-induced right-beating nystagmus suggest vestibular neuritis on the left from which Plaintiff has incompletely compensated. *Id*. Similar findings are confirmed in the physical therapy records that Plaintiff underwent to treat vestibular system dysfunction. (AR 471-544). The ALJ made no findings regarding this opinion and testing or how these findings impacted the RFC; nor did the ALJ discuss how the RFC accounts for Plaintiff's symptoms of vertigo, vagal episodes, or migraines. The record evidence shows that Plaintiff compensates for her vertigo by lying down. If these tests and findings had been discussed and Plaintiff's testimony credited, the ALJ may have included limitations in the RFC that preclude all work based on the vocational expert's testimony.

Finally, Plaintiff criticizes the RFC for not being based on any medical opinion. *See Suide v. Astrue*, 371 F. App'x 684, 690 (7th Cir. 2010); *Black v. Colvin*, No. 4:13-CV-79, 2015 WL 1005405 (N.D. Ind. Mar. 3, 2015). Although the RFC is an administrative determination, once the ALJ gave only light weight to the treating opinion of Dr. Amico, the remaining evidence of record must support the RFC, and, in this case, it does not. *See Suide*, 371 F. App'x at 690 ("[T]he rest of the record simply does not support the parameters included in the ALJ's RFC determination."). On remand, the ALJ will have an opportunity to explain how the cited records support the RFC determination.

## CONCLUSION

Based on the foregoing, the Court hereby **GRANTS** the relief sought in the Brief in Support of Plaintiff's Motion for Summary Judgment [DE 17], **REVERSES** the final decision of the Commissioner of Social Security, and **REMANDS** this matter for further proceedings consistent with this Opinion and Order.

So ORDERED this 22nd day of February, 2018.

s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT